# EXHIBIT 2

*Antitrust*, Vol. 26, No. 1, Fall 2011. © 2011 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

# E-Discovery and Antitrust Litigation

## BY F. MATTHEW RALPH AND CAROLINE B. SWEENEY

**E**VER SINCE THE SUPREME COURT first articulated the "rule of reason" in 1918,[1] antitrust cases have been famously complex and expensive. The complexity and expense are only compounded in cases where parties must litigate market definition. Thus it is not surprising that when the Supreme Court clarified pleading principles to reduce the burdens of litigation, it did so with an antitrust case.[2] In *Twombly* the Court noted that "proceeding to antitrust discovery *can* be expensive,"[3] but that is an understatement. It *will* be expensive, from the moment litigation is reasonably anticipated.

Electronic discovery, or e-discovery, remains a major driver (or accelerator) of litigation expense, notwithstanding the 2006 e-discovery amendments to the Federal Rules of Civil Procedure. But despite the seemingly obvious connection between e-discovery and antitrust litigation, few of the most important or influential judicial decisions on e-discovery have been issued in antitrust cases.[4]

This article surveys recent developments in e-discovery that are particularly relevant to antitrust cases: (1) the duty to preserve ESI and the events that trigger this duty; (2) the interrelated norms of proportionality and cooperation that regulate e-discovery; and (3) the implementation of those norms in several e-discovery practices that are designed to reduce costs: ESI protocols, custodian-centric discovery, search term methodologies, document review technologies, Rule 502 orders and agreements, and production formats.[5]

The technical aspects (and jargon) of e-discovery can intimidate lawyers, and the costs can both mystify and infuriate clients. E-discovery is rife with traps for the unwary. Missteps can give rise to sanctions,[6] and e-discovery costs may be awarded to prevailing parties.[7] E-discovery is an important part of antitrust litigation, and although much of the work will be done by staff and contractors trained in electronic technologies, the lawyer must understand the issues well enough to protect the integrity of the client's e-discovery production. This article tries to provide both guidance and reassurance. Although e-discovery is complex and dynamic in its details, the norms guiding its development are few, simple, and straightforward.

## Electronically Stored Information

ESI, like any information, is discoverable in litigation, but what makes ESI different is its sheer volume. By some estimates, more than 99 percent of newly produced information is created and stored electronically,[8] and discovery in antitrust litigation can embrace huge quantities of data. For example, in *Intel Corp. Microprocessor Antitrust Litigation*, the plaintiff and Intel agreed that the litigation could produce the "largest electronic production in history," with Intel's production alone being "somewhere in the neighborhood of a pile 137 miles high."[9]

Large volumes of electronic data means a large potential universe to search for information responsive to discovery requests. The increase in electronic data over the last decade has coincided with an increase in litigation costs. A recent survey of Fortune 200 companies reported a 73 percent increase in litigation costs between 2000 and 2008. The companies responding to the survey also reported that they are spending up to a quarter of every dollar of global profit on U.S. litigation.[10]

## ESI and the Duty of Preservation in Antitrust Litigation

All litigants have a duty to preserve potentially relevant documents when litigation is reasonably anticipated, and a party's duty of preservation unquestionably extends to ESI.[11] But what is "reasonable anticipation" in the context of antitrust litigation? That is what one district court recently discussed in the *In re Delta/Airtran Baggage Fee Anti-Trust Litigation*.[12]

***Triggering the Duty.*** In February 2009, the United States Department of Justice (DOJ) Antitrust Division issued a Civil Investigative Demand (CID) in connection with a confidential investigation of the "first bag fee" for checked luggage. Delta immediately conducted an internal investigation and identified twenty-two potential document custodians, including "employees within Delta's airport customer service team and Delta's revenue management team (the two divisions within Delta that had a role in evaluating the first-bag fee), and all members of Delta's corporate leadership team (Delta's senior-most executives who made the decision to adopt a first-bag fee in October/November 2008)."[13] One day after receiving the CID, Delta's inside counsel e-mailed a document preservation and litigation-hold notice to each of the twenty-two custodians (and some administrative assis-

*F. Matthew Ralph, an attorney in the Antitrust Practice Group of Dorsey & Whitney LLP, will become a partner in the firm in January 2012. He is Vice-Chair of the Minnesota State Bar Association's Antitrust Section and an adjunct professor of antitrust at the University of St. Thomas. Caroline Sweeney is Director of Litigation Technology Services at Dorsey & Whitney LLP. The authors thank Michael A. Lindsay for his input, and Charles K. LaPlante for research assistance.*

tants as well). The DOJ did not start litigation, and it did not otherwise bring proceedings to enforce the CID. The first of several private-party civil complaints was filed on May 22, 2009.

The private plaintiffs claimed that the service of the CID was enough to trigger Delta's duty to preserve documents for the private civil litigation. Describing plaintiffs' argument as "a sweeping and novel theory," the court rejected it on two grounds. First, the CID imposed a duty on Delta to the DOJ, but that is different from a duty to the private plaintiffs, who have no standing to enforce the DOJ's civil process. Second, service of a CID does not create an unrebuttable presumption that civil litigation is reasonably foreseeable. "No court has so held, and this Court is unwilling to be the first."[14]

Although *Delta/Airtran* teaches that a receipt of a CID alone does not trigger a duty of preservation running to potential private plaintiffs, it does not tell us what is sufficient, and antitrust lawyers must look to cases from other substantive areas of law that have addressed the duty to preserve documents. As in other litigation, the preservation duty in an antitrust case may not arise until the first complaint is filed,[15] but the triggering of the duty will be case-specific. A good rule of thumb is that the litigation must be "specific, predictable, and identifiable,"[16] and receiving a copy of a complaint before it is filed (whether by service or otherwise) or receiving a letter requesting the preservation of relevant documents from a potential claimant's lawyer have been deemed sufficient to trigger the preservation duty.[17]

### Preserving ESI

A number of duties (or at least standards of good conduct) related to the preservation of ESI have attained consensus status. For example, most courts are now likely to agree with Judge Shira Scheindlin that a party may breach its duty to preserve ESI by failing (1) to issue a written litigation hold, (2) to collect and preserve documents from key persons with the most relevant knowledge, or (3) to suspend the automated destruction of ESI.[18]

For example, in the *Intel Microprocessor* antitrust litigation, Intel took immediate and extensive steps to ensure appropriate preservation of documents. The day the complaint was filed, Intel assembled a team to begin a six-continent document preservation plan. One day later, Intel began "a company-wide snapshot of e-mail and other electronic documents stored in Intel servers," and the next day Intel sent a hold notice to 4000 employees, with a more detailed notice later going to 1500 employees. Within a few days of the complaint's filing, Intel had begun to collect paper and electronic documents from the first round of employees, and within about two months it had begun a weekly preservation of back-up tapes.

What Intel failed to do, however, was suspend the auto-delete function of its email system. Intel eventually discovered that substantial volumes of ESI had been deleted despite its initial preservation efforts. Intel's outside counsel investigat-

ed, and Intel then implemented remedial measures. Intel disclosed the lapses to its opponents.[19] Notwithstanding Intel's claims that all document deletion had been inadvertent, the court ordered Intel to produce notes prepared by Intel's outside counsel of its investigative interviews of Intel document custodians.[20]

While suspension of email auto-delete functions is now a fairly well recognized standard of conduct, many other e-discovery standards of conduct (or duties) have not achieved the same level of acceptance. When it comes to e-discovery, it is therefore important (and reassuring) to remember that "[c]ourts cannot and do not expect that any party can meet a standard of perfection."[21] Instead, they "expect that litigants and counsel will take the necessary steps to ensure that relevant records are preserved when litigation is reasonably anticipated, and that such records are collected, reviewed, and produced to the opposing party."[22]

Here again, *Delta/Airtran* is instructive. According to the reported facts, Delta took the same steps in the DOJ's antitrust inquiry that one would expect to be taken in any non-antitrust civil litigation: Delta determined the nature of the DOJ's inquiry, conducted an investigation, identified the individuals involved in the decision at issue (and consulted with the DOJ about the identification), sent a written litigation-hold notice, and in the ensuing weeks collected both paper and electronic documents (including emails).[23]

As often happens in the real world, the process was not perfect. For example, the written hold notice missed one custodian. But the court was satisfied with the explanation—the individual had received the same notice orally, his documents were collected, and his e-mails were already being preserved anyway pursuant to a litigation hold in an unrelated matter. Likewise, the initial email preservation may not have been perfect at the outset, but it was strengthened when more information emerged about the email system.[24] Similarly, Delta also waited until several months after receiving the CID before instructing its outside vendor to suspend the overwriting of back-up tapes, and even then the vendor did not act to suspend the over writing until nearly three weeks later.[25] But absent evidence that the delay was intentional, the court concluded that the "failure to act more quickly does not prove bad faith."[26]

### Proportionality and Cooperation in E-Discovery

Courts increasingly rely on norms of "proportionality" and "cooperation" to determine the amount of E-discovery that is appropriate in a particular case and whether parties have acted reasonably in e-discovery.

*Proportionality.* The norm of proportionality derives from Rule 26(b)(2)(C)(i)–(iii) and Rule 26(g)(1)(B)(iii), which collectively require both courts and lawyers to weigh the expected benefits and burdens posed by particular discovery requests to ensure that requests for ESI are neither unreasonable nor unduly burdensome or expensive. Reasonableness and burden are determined using such factors as the

importance of the evidence sought to be discovered to the requesting party's ability to prove its claims, prior discovery in the case, the availability of discovery from more convenient sources, and the amount in controversy or importance of the litigation.[27]

In 2010, the Sedona Conference—a nonprofit legal policy research and education organization whose influential publications concerning ESI are cited with increasing frequency by federal courts[28]—published a *Commentary on Proportionality in Electronic Discovery* that summarizes the basic principle: "The burdens and costs of preservation of potentially relevant information should be weighed against the potential value and uniqueness of the information when determining the appropriate scope of preservation."[29]

***Cooperation.*** In *Twombly*, the Supreme Court expressed significant doubt about the practical ability of district courts to control the scope and extent of discovery (generally, not just ESI) in antitrust litigation. The Court quoted Judge Frank Easterbrook extensively, citing such factors as "the judicial officer always knows less than the parties," a "magistrate supervising discovery does not—cannot—know the expected productivity of a given request, because the nature of the requester's claim and the contents of the files . . . of the adverse party are unknown," and "[j]udicial officers cannot measure the costs and benefits to the requester and so cannot isolate impositional requests."[30] The conclusion, however, was the Court's own: "Given the system that we have, the hope of effective judicial supervision is slim."[31]

Lower courts increasingly agree that the parties must be primarily responsible for controlling the scope and extent of e-discovery in general.[32] As one district court observed, "The Federal Rules of Civil Procedure, case law, and the *Sedona Principles* all further emphasize that electronic discovery should be a party-driven process."[33] Courts have cited approvingly[34] the Sedona Conference's *Cooperation Proclamation* "to promote open and forthright information sharing, dialogue (internal and external), training, and the development of practical tools to facilitate cooperative, collaborative, transparent discovery."[35] Under the emerging norms of e-discovery cooperation, a party that refuses to negotiate runs the risk of appearing "patently unreasonable."[36]

## Practices to Address Overbroad Discovery Requests

Consensus is nearing that e-discovery costs are driven in substantial part by asymmetrical information. A party requesting ESI is not only likely, but virtually compelled, to make overly broad and unduly burdensome requests simply because the discovering party does not have sufficient information about its opponent's ESI holdings and systems (or the processes that its opponent must employ to identify, review, and produce documents) to permit more tailored requests to reduce the compliance burden.[37] Parties and courts increasingly rely on pre-discovery exchanges of information, enforced cooperation, and custodian-centric discovery to reduce costs associated with overbroad discovery requests.

***ESI Protocols and Pre-Discovery Information Exchanges.*** Before discovery requests are served, many parties now use (and courts now endorse) ESI protocols for reciprocal initial disclosures about e-discovery. ESI protocols may cover such topics as (1) the types of ESI technology systems in use; (2) the persons most knowledgeable in their operation; (3) document retention and destruction policies; (4) the custodians of relevant ESI; (5) the types of relevant ESI and software supporting them (e.g., e-mail, voice mail, archived data, back-up or disaster recovery data, laptops, personal computers, PDAs, deleted data); (6) the identification of "not reasonably accessible sources" of ESI; (7) the format in which production will occur (e.g., will records be produced in "native," near-native, or image only; what metadata is sought); and (8) the anticipated burdens and expenses that the producing party will face based on the Rule 26(b)(2) factors, and how they may be reduced.[38] Such disclosures allow parties to serve more tailored discovery requests earlier and to avoid costly and time-consuming Rule 30(b)(6) depositions to obtain the same information.

The DOJ follows this trend and advocates early dialogue with subjects of investigation.[39] For example, before formulating requests that encompass database information, Division attorneys are encouraged to obtain information about (1) the fields of information available; (2) how the data is formatted and collected; (3) how frequently the data is collected or supplemented; (4) what software is used; (5) what size the data set is, and (6) what reports are routinely generated from the database.

The Federal Trade Commission also encourages early cooperation and discussion. As noted in the best practices section of their website, "The burdens of compliance with data requests can often be significantly reduced if the parties engage staff at the earliest opportunity. One of the goals of early interaction with the parties' counsel . . . is to determine what data is available, its suitability, and in what form, in order to make it easier for the parties to provide the data."[40]

***Enforced Cooperation.*** If parties cannot bring themselves to cooperate, federal judges are increasingly likely to impose cooperation. For example, in the *Polyurethane Foam Antitrust Litigation*, the court ordered the parties to negotiate an ESI protocol.[41] The resulting document not only covered the topics discussed above, but also allocated the costs of ESI production among the parties, established a procedure for mutually agreeing on search terms, and required each party to designate an "e-discovery coordinator" to interface with other parties on e-discovery issues.[42] Similarly, when resolving an ESI dispute in the *eBay Seller Antitrust Litigation*, the court ordered the parties to "engage in an in-person, face-to-face, conference regarding such disputes before any further [ESI-related] discovery motion is filed" and to "focus strictly on the ESI issues during the conference, reserving any discussion of the merits or other issues for another time."[43] Courts in non-antitrust litigation have reached similar results.[44]

Disputes will nevertheless arise, and courts may be inclined to require further negotiations rather than resolve the dispute themselves. For example, in the *Online DVD Rental Antitrust Litigation*, a party served a nonparty with a subpoena for voluminous transactional data. The court did not resolve the issue itself but required the parties to cooperate on a resolution, directing them to meet and confer in person at the third party's headquarters so that its information technology staff could work directly with counsel in developing a plan for production.[45]

Of course, when courts rule on e-discovery disputes, the outcome is likely to depend on the degree to which the parties' conduct has already been cooperative and proportional. In fact, courts have applied these principles to *nonparties* as well. In the *Static Random Access Memory (SRAM) Antitrust Litigation*, the court ordered production of voluminous ESI by a nonparty that had been subpoenaed in mid-2008 but still had not produced anything by early 2010.[46] Similarly, in *Online DVD Rental* the court noted that although the production of voluminous transactional data from a nonparty may be unusual, "the production of this kind of data in an antitrust case is routine and happens in every case."[47] As a result, the nonparty was ordered to meet and confer—just as parties would have been required to do.

### Custodian-Centric Discovery

Perhaps the most effective way to reduce the volume of ESI at issue in a case is to limit the number of custodians whose ESI will be produced. The proportionality norm supports such limitations. Producing documents from only those custodians who have the "most relevant" documents tends to ensure that the costs of e-discovery are tailored to the needs of the case. But given each party's right under Rule 26(b) to obtain discovery of "all relevant" information—not just the "most relevant" information—it is rarely possible for a party to impose such limits unilaterally.

Negotiating a limit on the number of custodians typically requires the producing party to disclose information about the job responsibilities and functions of various employees during the relevant period. This information might be shared informally by letter or telephone conference, by voluntary production of documents such as organizational charts, or by Rule 30(b)(6) depositions. The negotiations should be guided, where possible, by information about the ESI holdings of potential custodians, including both the ESI in each potential custodian's immediate possession (i.e., custodial ESI) but also ESI to which the custodian has access (i.e., non-custodial ESI).

Interviewing a client's key potential custodians can be indispensable, and interviewing information technology staff is often necessary as well. Questionnaires can be used to obtain such information efficiently, but frequently follow-up is necessary. The Division offers a sample *Questionnaire on Electronically Stored Information* on its website.[48] Pro-active corporations or counsel often develop some kind of general or case-specific "data map" to facilitate an understanding of the corporation's electronic data sources. The data map serves as a guide to the location of data throughout the company and to the persons responsible for creating and maintaining that data, along with retention periods, back-up policies, auto-delete functions, and more.

Early data assessment tools, (examples include Clearwell or Kazeon) permit counsel to sample data from different custodians to determine its degree of relevance, both as a percentage of that custodian's total files and in comparison to other potential custodians. Sampling thus permits identification of custodians who have the "most relevant information." Early data assessment also permits vetting of potential keyword terms or search methodologies on a limited number of high priority custodians in order to determine their likely effectiveness on lower priority custodians.

These objectives can also be accomplished, or enhanced, through phased or incremental discovery. By collecting and processing ESI from the highest priority custodians first, it may be possible to refine search methodologies for custodians whose documents are to be produced later, or to confirm that no further productions are necessary.

### Practices to Reduce Document Review Costs

*Use of Search Technology.* Technology can help reduce a mass of ESI to smaller, more manageable, and more useful document sets. One frequently applicable culling strategy is to use electronic searches to eliminate documents outside of a specified date range and review only documents from a relevant time period. Another technique is automated removal of duplicative ESI. "De-duplication" software extracts a unique identifier for each electronic file (think "digital DNA") and uses it to remove copies of identical files. De-duplication may be applied "vertically," to ESI held by a single custodian, or "horizontally," to ESI held by multiple custodians. The Division's template for an Electronic Production Letter endorses both the "vertical de-duplication" of ESI held by a single custodian and the "horizontal de-duplication" of ESI held by multiple custodians to reduce the volume of data for review and production;[49] however, "[t]he Division estimates that de[-]duplication can reduce production volumes by as much as 40%."[50] The Division also identifies other filtering techniques to help control costs, such as exclusion of all documents with obviously irrelevant domain names (e.g., .espn, .cnn, etc.).[51] In contrast, the FTC allows for vertical de-duplication but requires the producing party to seek approval before implementing horizontal de-duplication.[52]

Other data reduction strategies include "near de-duplication" and "email thread suppression." Near de-duplication allows removal or grouping of similar but not identical documents (e.g., contract versions). Email thread suppression sifts through email chains and identifies the emails that are last in time chronologically and that thus contain the entire chain (eliminating the need to review each email comprising

the ultimate chain). These techniques not only substantially reduce ESI volume for review, but they also enhance consistency of the review process.[53]

Advanced search methods are frequently indispensable to cost reduction.[54] Boolean searches that employ logical concepts such as "OR," "AND," or "NOT" can enhance the effectiveness of keyword searches. Proximity operators can be used to identify keywords in relationship to one another, e.g. searching for the word "department" within two words of "justice (department w/2 justice) to find references to "Department of Justice." Commands for identifying roots or stems of words (e.g., words without prefixes or suffixes, or verbs without endings) permit searches of all possible variations of keywords, e.g., searching for all instances of "monopol," regardless of ending (i.e., monopol!), for documents related to monopoly or monopolization. Still other technologies offer concept searching and concept clustering, which find or organize documents based on the similarity, frequency, proximity, and/or interrelationships of particular terms in a document. They may be used to establish "relevancy rankings," that can be used to reduce large amounts of ESI or to prioritize review.[55]

But technology has its limits. Search methodologies leave substantial room for discretion, and for error. Magistrate Judge Paul W. Grimm of the U.S. District Court for the District of Maryland has emphasized that counsel, before relying on search methodologies for ESI culling, should: (1) identify the options for search methodologies and their comparative costs; (2) select search terms carefully and tailor them to the applicable search method; (3) select the search terms in consultation with a person knowledgeable about the relevant documents and, if possible, with a person knowledgeable about the search method; and (4) perform quality-assurance tests by sampling the results of searches for over-inclusiveness or under-inclusiveness.[56]

Cooperation in the development of search methods has great potential to reduce not only the volume of ESI at issue in a case (and therefore the costs) but also the incidence of discovery disputes. For this reason, courts and parties increasingly apply the norms of cooperation and proportionality to the development of search protocols.[57] For example, the ESI protocols in both the *Polyurethane Foam and Plasma-Derivative Protein Therapies* antitrust litigations established procedures for negotiating mutually agreeable search terms.[58]

**Rule 502 Orders and Agreements.** Parties can also cooperate to reduce the costs of pre-production review of ESI by agreeing on a protocol for limited pre-production review under Rule 502 of the Federal Rules of Evidence.

One particular driver of costs that has received substantial attention is the risk that inadvertent production of privileged documents may result in a subject matter waiver. In the best of all possible worlds (and setting aside the issue of cost), each producing party would prefer to review every document before production to determine whether the document (1) is responsive to discovery requests, (2) should

be withheld, redacted, or stamped "confidential" because it contains sensitive personal or commercial information, and (3) may be withheld on grounds of attorney-client privilege or work product doctrine (collectively "privileged documents"). Given that e-discovery frequently encompasses hundreds of thousands, if not millions, of potentially discoverable documents, the burden of performing such a document-by-document pre-production review frequently imposes huge costs that are disproportionate to the litigation stakes and that may dramatically lengthen the time necessary to produce documents.

The 2007 amendments to Rule 502 of the Federal Rules of Evidence sought to reduce these risks, and their related costs, by creating rules governing privilege waiver in federal courts and safe harbors against waiver through inadvertent production.[59] Amended Rule 502(a) limits subject-matter waiver to situations in which waiver was intentional, the undisclosed communications concern the same subject matter as disclosed communications, and both the disclosed and undisclosed communications "ought in fairness to be considered together."[60] Significantly, for e-discovery purposes, amended Rule 502(b) provides that inadvertent disclosure can never result in subject-matter waiver, and inadvertent disclosure does not result in waiver as to inadvertently produced documents if "the holder of the privilege or protection took reasonable steps to prevent disclosure" and "the holder promptly took reasonable steps to rectify the error."[61]

To further reduce costs associated with privilege review and expedite document production, amended Rule 502 gives "controlling effect" to court orders and parties' agreements to limit or eliminate privilege waivers or to permit "claw-backs" of privileged documents.[62] Clawback provisions permit a party to undo a document production and demand return of documents that the party belatedly determines are protected by the attorney-client privilege or work product immunity. While most clawback provisions allow return of such documents without waiver, or irrespective of the care taken by the disclosing party,[63] some courts have treated the right to claw back documents as distinct from the issue of waiver.[64]

While the waiver standards and safe harbors of Rule 502(a) and (b) apply to documents produced either in federal litigation or to federal offices or agencies that are "acting in the course of [their] regulatory, investigative or enforcement authority,"[65] antitrust litigators should beware that agreements under Rule 502(e) to limit pre-production review or impose clawbacks are effective only in federal litigation, not in federal investigations. Neither the DOJ nor FTC seem to have yet adopted policies regarding the efficacy of such agreements in the investigative context, their effect on subsequent litigation, or the circumstances in which producing parties may seek Rule 502(d) court orders before producing documents in response to investigative demands. Anecdotal experience suggests that different regulators approach the issues in different ways.

Emerging technologies offer new prospects for reducing costs while increasing consistency in the review process. A recent study by the Electronic Discovery Institute compared the cost of using 225 attorneys versus automated review technology in responding to a DOJ request.[66] The results of this study suggest that use of an automated review system[67] "will yield results that are comparable to the traditional practice in discovery and would therefore appear to be reasonable."[68]

While courts have not formally opined on automated review technologies, and private parties and government agencies are still vetting them, Southern District of New York Magistrate Judge Andrew Peck recently commented very favorably on automated review: "In my opinion, computer-assisted coding should be used in those cases where it will help 'secure the just, speedy, and inexpensive' (Fed. R. Civ. P. 1) determination of cases in our e-discovery world."[69]

# Jargon-Translator

Here are plain-English explanations of some of the terms used in this article. For additional guidance, see *The Sedona Conference Glossary: E-Discovery & Digital Information Management* (3d ed. 2010).[1]

**Bits and Bytes**—One unit of ESI is called a bit (a binary digit, either 1 or 0), and 8 bits make a byte. Bytes are aggregated into kilobytes (1,024 bytes), megabytes (1,048,576 bytes), gigabytes (1,073,741, 824 bytes), and terabytes (about 1.1 trillion bytes).[2] To put this into context, a single type-written page contains approximately 2 kilobytes of information; the complete works of Shakespeare include about 5 megabytes; a floor of books in a library contains about 50 gigabytes;[3] and the print collection in Library of Congress includes about 10 terabytes.[4] A large corporation is likely to have far more information stored in computers than the equivalent of the entire paper and digital collection of the Library of Congress.[5]

**Native**—Refers to the format in which the file was created and is stored in the normal course of business. The native form of the document includes the associated metadata for the document and often requires the originating software in order to view the file. For example, the "native" form of an Excel file requires the use of Microsoft Excel to properly view the document, formulae, hidden columns, and/or hidden rows.

**Near-Native Format**—Most frequently construed to mean a way in which native file information can be electronically produced without actually producing the native file. Production of an image of the document with the extracted text and agreed-upon metadata fields is most often considered to be a "near native" production.

**.TIFF—Tagged Image File Format**—Widely used and accepted image format. This format may be single-page or multi-page format, in color or black-and-white

**OCR**—Optical Character Recognition—The process whereby an image of a document is converted to searchable content, allowing the user of the file to conduct keyword searches against the file. OCR quality is dependent on the quality of the image file (and, therefore, the original document).

**Text-searchable**—The ability to search the content of a document using keywords. The OCR process makes a document text-searchable.

**Boolean**—Search technique, named for mathematician George Boole, that employs logical concepts, such as "AND," "OR," or "NOT," in keyword searches to include or exclude documents from a search set.

**De-Duplication**—The process of removing exact duplicate documents from a collection of electronic data in order to reduce the overall volume of documents for review and production. De-duplication requires the extraction of a unique identifier for the electronic file (referred to as the HASH value) and comparison of the unique values in the electronic file collection in order to identify and remove duplicative documents. De-duplication may be applied within a single custodian's set of data (vertical de-duplication) or across the universe of custodians' data (horizontal de-duplication).

**Metadata**—Frequently described as "data about data" or the "digital DNA" of an electronic document. For the most part, metadata is not readily apparent when an electronic document is viewed or printed but it is considered to be part of the definition of an electronic document. Some metadata is created by the users of a document, but most metadata is generated by the file system (e.g., Microsoft Windows) or the software application (e.g. Microsoft Word). There is no definitive list of "metadata." The types of available metadata vary from application to application and even from version to version of a software program. For example, the metadata available in Microsoft Word is different than the metadata available in WordPerfect or Microsoft Excel, and the metadata available for Microsoft Word 97 is different from that available for Microsoft Word 2000.

---

[1] http://www.thesedonaconference.org/dltForm?did=glossary2010.pdf.

[2] The Sedona Conference, *The Sedona Conference Glossary: E-Discovery & Digital Information Management* (3d ed. 2010), http://www.thesedona conference.org/dltForm?did=glossary2010.pdf; *see also* The Electronic Discovery Reference Model (EDRM) Glossary, http://www.edrm.net/resources/glossary.

[3] *See How Much Data Is That?*, http://www.jamesshuggins.com/h/tek1/how_big.htm.

[4] *See id.*

[5] *See* RALPH C. LOSEY, E-DISCOVERY: CURRENT TRENDS AND CASES 33 (2008) (noting that in the Enron bankruptcy, "they found twice as much information stored in [Enron's] computers as in the Library of Congress—over 78 billion pages").

## Production Format: A Study in Trade-Offs

Norms of cooperation and proportionality also apply to the format in which ESI is produced. Rule 34 of the Federal Rules of Civil Procedure allows a requesting party to specify the production format of ESI, but it also allows a responding party to object to such format and produce it in a different format that is "reasonably usable." At least one court has concluded that producing ESI in hard copy format is not "reasonably usable" because it lacks the metadata associated with the ESI.[70] Consequently, most ESI productions tend to be in native format, near-native format, or both.

Producing in native format is often thought to be less costly because it saves the costs of converting native files to image format (typically .TIFF) or rendering them text-searchable through optical character recognition (OCR). But there are significant countervailing considerations. First, virtually all review platforms can view image formats such as .TIFF, but, with a native production, the receiving party cannot view the files unless it has the native application (or a viewer). Unusual (or highly customized) applications can be expensive or hard to acquire. If the receiving party must ultimately incur the cost of converting the native files to a standardized format, then its reason for specifying the native-format production in the first place will largely be defeated.

Second, the producing party may have legitimate concerns about the security of productions in native format. Producing documents in native format makes it impossible to use automated processes to Bates-number individual pages or to mark them as confidential. Nor does native-format production permit redaction of privileged, confidential, private, or non-responsive information without changing the original electronic document.[71]

Third, review of files in native format may be substantially slower (and therefore substantially more costly in terms of attorney time) simply because many review platforms toggle through native files more slowly than through .TIFFs. These slight delays in screen changes can add up to hundreds of hours of lost time in large reviews. Regardless, certain types of files (e.g., large spreadsheets or presentations with animation or audio) often must be produced in native format simply because they cannot be readily converted to image format without rendering them virtually unusable.[72]

Consequently, most parties tend to reach agreement on a production format that comprises both native and near native. In these instances, certain limited types of ESI (e.g., MS Excel, MS PowerPoint) are produced in native format while the rest (e.g., MS Outlook, MS Word) are produced in near native format, often with accompanying metadata files.[73] Both the Division's and FTC's guidelines adopt similar principles.[74]

## Conclusion

As the volume and sources of ESI grow, the skyrocketing costs of preserving, collecting, reviewing, and producing it will continue to increase. The fundamental challenge of e-discovery is to balance the need to preserve and access potentially probative ESI with the need to prevent its associated costs from overwhelming the amount at stake in litigation or from preventing the just and speedy resolution of disputes. Courts, clients, and counsel increasingly view e-discovery as a "party-driven process" that should be guided by norms of cooperation and proportionality.

Antitrust litigators—indeed all litigators—need to understand how these norms can be implemented in various practices (such as ESI protocols, custodian-centric discovery, search term methodologies, document review technologies, Rule 502 orders and agreements, and production formats) to manage e-discovery in each case toward a successful conclusion. ◼

---

1  Bd. of Trade of City of Chicago v. United States, 246 U.S. 231, 238 (1918)) (court should consider "facts peculiar to the business to which the restraint is applied," "its condition before and after the restraint was imposed," "nature of the restraint," actual or probable effect, history of the restraint, "the evil believed to exist, the reason for adopting the particular remedy, [and] the purpose or end sought to be attained").

2  Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

3  *Id.* at 558.

4  Antitrust magazine has published some of the few articles to appear on antitrust and e-discovery. *See* Jack E. Pace III & John D. Rue, *Early Reflections on e-Discovery in Antitrust Litigation: Ten Months into the New Regime*, ANTITRUST, Fall 2007, at 67; Gregory G. Wrobel, Andrew M. Gardner & Michael J. Waters, *Counsel Beware: Preventing Spoliation of Electronic Evidence in Antitrust Litigation*, ANTITRUST, Summer 2006, at 79.

5  Many e-discovery topics are beyond the scope of this article but are addressed in the case law. *See, e.g.*, Zubulake v. UBS Warburg LLC (*Zubulake I*), 217 F.R.D. 309 (S.D.N.Y. 2003) (cost-shifting for discovery of emails from "inaccessible" sources); Zubulake v. UBS Warburg LLC (*Zubulake III*), 216 F.R.D. 280 (S.D.N.Y. 2003) (responding party to pay 75 percent of costs, including all attorney review costs, to produce email from inaccessible data); Zubulake v. UBS Warburg LLC (*Zubulake IV*), 220 F.R.D. 212 (S.D.N.Y. 2003) (sanctions for negligent destruction of backup tapes); Zubulake v. UBS Warburg (*Zubulake V*), 229 F.R.D. 422 (S.D.N.Y. 2004) (counsel has ongoing duty to monitor preservation and collection efforts); Lorraine v. Markel Am. Ins. Co., 241 F.R.D. 534 (D. Md. 2007) (admissibility of electronic records); Aguilar v. Immigration and Customs Enforcement Div., 255 F.R.D. 350 (S.D.N.Y. 2008) (metadata).

6  As a 2010 study has recently shown, the incidence of court-ordered sanctions for conduct related to e-discovery has been rapidly increasing since 2007. Dan H. Willoughby, Jr. et al., *Sanctions for E-Discovery Violations: By the Numbers*, 60 DUKE L.J. 789 (2010). Sanctions of outside counsel, though still rare, are also occurring more frequently. *Id.* at 816–23.

7  E-discovery costs have recently been awarded to prevailing parties in two antitrust actions. See Race Tires Am., Inc. v. Hoosier Racing Tire Corp., No. 2:07-cv-1294, 2011 WL 1748620 (W.D. Pa. May 6, 2011) (affirming clerk's taxation of e-discovery costs in the amount of approximately $367,000); Clerk's Taxation of Costs (Doc. No. 206), Hank's Beverage Co. v. Ajinomoto Co. (*In re* Aspartame Antitrust Litig.), No. 06-cv-1732 at ECF Doc. 206 (E.D. Pa.) (approximately $565,000 of e-discovery costs taxed by clerk as legitimate "exemplification costs").

8  David Isom, *Electronic Discovery Primer for Judges*, 2005 FED. CTS. L. REV. 1, *1.1 (Feb. 2005) (citing PETER LYMAN & HAL R. VARIAN, HOW MUCH INFORMATION? 2003), *available at* http://www2.sims.berkeley.edu/research/projects/how-much-info-2003/).

9 *In re* Intel Corp. Microprocessor Antitrust Litig., 258 F.R.D. 280, 283 (D. Del. 2008).

10 Federation of Defense & Corporate Counsel, *Skyrocketing Litigation Costs Compel Broad Revision of the Federal Rules of Civil Procedure: A Review of Proposed Rule Changes Submitted to the FDCC, LCJ, and Other Defense Groups to the Civil Rules Advisory Committee* 1, 1 (2011), *available at* http://www.thefederation.org/documents/12.Skyrocketing%20Litigation%20Costs.pdf.

11 *See, e.g.*, John B. v. Goetz, 531 F.3d 448, 459 (6th Cir. 2008).

12 770 F. Supp. 2d 1299 (N.D. Ga. 2011).

13 *Id.* at 1303.

14 *Id.* at 1308.

15 *See In re* Intel Corp. Microprocessor Antitrust Litig., 258 F.R.D. 280, 282 n.4 (D. Del. 2008) (adopting special master's report & recommendation) ("Since the triggering event for Intel's document preservation obligation is the first-filed AMD complaint, the Special Master does not reference the complaint filed on behalf of Class Plaintiffs.").

16 Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 522 (D. Md. 2010) (quoting The Sedona Conference, The Sedona Conference *Commentary on Legal Holds: The Trigger and the Process* 3 (public cmt. ed. Aug. 2007), *available at* http://www.thesedonaconference.org/content/miscFiles/Legal_holds.pdf).

17 *Id.* at 521–22 (citing cases).

18 Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 685 F. Supp. 2d 456, 465–66 (S.D.N.Y. 2010). But this agreement among judges is not universal. For example, even in Judge Scheindlin's own district, a Magistrate Judge has suggested that an oral hold is adequate in certain situations. *See* Merck Eprova AG v. Gnosis S.PA., No. 07 Civ. 5898 (RJS), 2010 WL 1631519, at *5 (S.D.N.Y. Apr. 20, 2010).

19 *Intel Corp.*, 258 F.R.D. at 282–84.

20 *Id.* at 282. The court permitted certain redactions of core work product.

21 *Pension Comm.*, 685 F. Supp. 2d at 461–62.

22 *Id.*

23 770 F. Supp. 2d 1299, 1303 (N.D. Ga. 2011).

24 *Id.* at 1304. Delta's legal department directed its IT department to "(1) copy each CID custodian's hard drive and the entire contents of the custodian's Microsoft Outlook profile, such as e-mail, calendar entries, and other data items not stored within Delta's Microsoft Exchange Server Environment; and (2) place each of the CID custodians on a separate server where Delta's auto-delete policy for e-mails remaining in an employee's inbox or sent items folder for longer than sixty days did not apply." *Id.*

25 *Id.* The plaintiffs challenged the timing of this instruction.

26 *Id.* at 1313.

27 *See, e.g.*, Regan-Touhy v. Walgreen Co., 526 F.3d 641, 649 (10th Cir. 2008); Rimkus Consulting Group, Inc. v. Cammarata, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010); Mancia v. Mayflower Textile Servs. Co., 253 F.R.D. 354, 358 (D. Md. 2008); The Sedona Conference, *The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production*, at 17 cmt. 2.b. (July 2005 ed.).

28 *See* http://www.thesedonaconference.org/content/faq.

29 The Sedona Conference, *The Sedona Conference Commentary on Proportionality* (2010), *available at* http://www.thesedonaconference.org/publications_html

30 Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 n.6 (2007) (quoting extensively from Frank H. Easterbrook, *Discovery as Abuse*, 69 B.U. L. Rev. 635, 638–39 (1989)).

31 *Id.*

32 Contrary to these trends, Professor Richard Epstein has recently argued that, in antitrust and other complex cases, courts should exercise more control over discovery rather than less, and that discovery should be phased or progressive, with a plaintiff required to show, at specific points, that further discovery would justify the additional cost. Richard A. Epstein, *Of Plead-*

*ing and Discovery: Reflections on* Twombly *and* Iqbal *with Special Reference to Antitrust*, 2011 U. Ill. L. Rev. 187, 201, 206–07 (2011).

33 Aguilar v. Immigration and Customs Enforcement Div., 255 F.R.D. 350, 358 (S.D.N.Y. 2008).

34 *See, e.g.*, William A. Gross Constr. Assocs. v. Am. Mfrs. Mut. Ins. Co., 256 F.R.D. 134, 136 (S.D.N.Y. 2009); Mancia v. Mayflower Textile Servs. Co., 253 F.R.D. 354, 363 (D. Md. 2008).

35 The Sedona Conference, *Cooperation Proclamation* 1 (2008), *available at* http://www.thesedonaconference.org/content/tsc_cooperation_proclamation/proclamation.pdf.

36 SEC v. Collins & Aikman Corp., 256 F.R.D. 403, 414 (S.D.N.Y. 2009)

37 *See generally William A. Gross*, 256 F.R.D. 134; *Mancia*, 253 F.R.D. 354; Hopson v. Mayor and City Council of Baltimore, 232 F.R.D. 228 (D. Md. 2005).

38 For a useful summary of topics that parties should discuss, see Hopson, 232 F.R.D. at 245. For cases involving use of ESI protocols, see, e.g., John B. v. Goetz, 531 F.3d 448, 453 (6th Cir. 2008); *In re* Facebook PPC Advertising Litig., No. C09-03043 JF (HRL), 2011 WL 1324516 at *1–*2 (N.D. Cal. Apr. 6, 2011); Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 511 (D. Md. 2010).

39 Ben Kerschberg, *Surviving E-Discovery with the Department of Justice's Antitrust Division*, Forbes, Feb. 24, 2011, *available at* http://www.forbes.com/sites/benkerschberg/2011/02/14/surviving-e-discovery-with-the-department-of-justices-antitrust-division/.

40 *See* http://www.ftc.gov/be/bestpractices.shtm.

41 *See* Initial Case Management Conference Order (Doc. No. 17), *In re* Polyurethane Foam Antitrust Litig., No. 10-MD-2196 (JZ), at 4 (N.D. Ohio Jan. 20, 2011).

42 *See* Order Regarding Electronically Stored Information (Doc. No. 245), *Polyurethane Foam*, at 2, 7, 10 (N.D. Ohio Sept. 16, 2011). Similarly, the ESI protocol negotiated in the *Plasma-Derivative Protein Therapies Antitrust Litigation* went into considerable detail. *See* Stipulation and Order for the Preservation and Production of Documents and Electronically Stored Information (Doc. No. 283), *In re* Plasma-Derivative Protein Therapies Antitrust Litig., No. 09-CV-7666 (N.D. Ill. Aug. 25, 2010). It set forth a process for counsel to work with identified custodians to conduct quarterly compliance audits, discussed the development of mutually agreeable search terms, and provided for the appointment of "discovery administrators" and "e-discovery liaisons" to coordinate the process. *See id.* at 7–8, 10.

43 *In re* eBay Seller Antitrust Litig., No. C 07-01882 JF (RS), 2007 WL 2852364, at *1 (N.D. Cal. Oct. 2, 2007).

44 *See In re* Facebook PPC Advertising Litig., No. C09-03043 JF (HRL), 2011 WL 1324516, at *2 (N.D. Cal. Apr. 6, 2011) (ordering parties to meet and confer and agree to an ESI protocol); *see also* Heraeus Kulzer, GmbH v. Biomet, Inc., 633 F.3d 591, 598 (7th Cir. 2011) (discussing defendant's "stonewalling" or refusal to cooperate by not meeting with the plaintiff to negotiate scope of discovery).

45 *See* Transcript of Proceedings (Doc. No. 268), *In re* Online DVD Rental Antitrust Litig., No. 09-MD-2029-PJH, at 6–7 (N.D. Cal. Oct. 7, 2010).

46 *See* Order by Special Master Granting Indirect Purchaser Plaintiffs' Motion to Compel the Production of Documents From Third-Party, Jabil Circuit, Inc. (Doc. No. 967), *In re* Static Random Access Memory (SRAM) Antitrust Litig., No. 07-MD-1819-CW (N.D. Cal. Mar. 1, 2010). The district judge upheld the special master's order over the non-party's objection. *See* Clerk's Notice Deeming Objection Denied (Doc. No. 983), *SRAM* (N.D. Cal. Apr. 6, 2010).

47 Transcript of Proceedings (Doc. No. 268), *Online DVD Rental*, at 3–4.

48 *See* http://www.justice.gov/atr/public/electronic_discovery/251122.htm.

49 *See* http://www.justice.gov/atr/public/electronic_discovery/237704.htm.

50 *See* Tracy Greer, E-Discovery Initiatives at the Antitrust Division, http://www.justice.gov/atr/public/electronic_discovery/243194.htm.

51 *See id.*

52 *See* http://www.ftc.gov/bc/guidance/starting/index.shtm#dedup.

53 The DOJ's Antitrust Division indicates that parties wishing to use these

types of data reduction methodology should raise the issue with the DOJ when discussing processing options. See id.

54 *See generally* Victor Stanley, Inc. v. Creative Pipe, Inc., 250 F.R.D. 251, 259 n.9 (D. Md. 2008); *The Sedona Conference Best Practices Commentary on the Use of Search & Information Retrieval Methods in E-Discovery* (2007), http://www.thesedonaconference.org/dltForm?did=Best_Practices_Retrieval_Methods___revised_cover_and_preface.pdf.

55 The Antitrust Division's Electronic Production Letter template approves the use of search methods generally but does "not address or endorse" any particular search method or technology. *See* http://www.justice.gov/atr/public/electronic_discovery/237704.htm.

56 *Victor Stanley*, 250 F.R.D. at 262; *see also* William A. Gross Constr. Assocs. v. Am. Mfrs. Mut. Ins. Co., 256 F.R.D. 134, 135–36 (S.D.N.Y. 2009).

57 *William A. Gross*, 256 F.R.D. at 135; *see also* Romero v. Allstate Ins. Co., 271 F.R.D. 96, 109 (E.D. Pa. 2010) (court expects counsel to "reach practical agreement" without judicial micro-management on "search terms, date ranges, key players and the like"); SEC v. Collins & Aikman Corp., 256 F.R.D. 403, 414 (S.D.N.Y. 2009) ("The SEC's blanket refusal to negotiate a workable search protocol responsive to these requests is patently unreasonable.").

58 *See* Order Regarding Electronically Stored Information (Doc. No. 245), *In re* Polyurethane Foam Antitrust Litig., No. 10-MD-2196 (JZ), at 7–8 (N.D. Ohio Sept. 16, 2011); Stipulation and Order for the Preservation and Production of Documents and Electronically Stored Information (Doc. No. 283), *In re* Plasma-Derivative Protein Therapies Antitrust Litig., No. 09-CV-7666, at 10 (N.D. Ill. Aug. 25, 2010).

59 *See* Fed. R. Evid. 502(a)–(b).

60 *Id.* 502(a).

61 *Id.* 502(b).

62 *See id.* 502(d)–(e).

63 *See, e.g.*, Rajala v. McGuire Woods, LLP, No. 08-2638, 2010 WL 2949582 at *3 (D. Kan. Jul. 22, 2010).

64 *See, e.g.*, Hoffman-LaRoche, Inc. v. Roxane Labs., Inc., No. 09-6335 (WJM), 2011 WL 1792791, at *12 (D.N.J. May 11, 2011); Victor Stanley, Inc. v. Creative Pipe, Inc., 250 F.R.D. 251, 255, 262–63 (D. Md. 2008).

65 *See* Fed. R. Evid. 502(b), Explanatory Note to 2007 Amendments.

66 Herbert L. Roitblat, Anne Kershaw & Patrick Oot, *Document Categorization in Legal E-Discovery: Computer Classification vs. Manual Review*, 61 J. Am. Soc'y for Info. Sci. & Tech. 70 (2010). The documents used in this study were collected as part of DOJ's investigation of the acquisition of MCI by Verizon. *Id.* at 73.

67 The "automated" review technology is not in fact completely automated; human eyes still review sample sets of documents. But through statistical sampling and search methods, the volume of documents requiring human review is limited to a small portion of the collection. *See id.* at 77.

68 *Id.* at 79.

69 Hon. Andrew Peck, Search, *Forward: Time for Computer-Assisted Coding*, L. Tech. News, Oct. 1, 2011, http://www.law.com/jsp/lawtechnologynews/PubArticleLTN.jsp?id=1202516530534.

70 *See* Covad Commc'ns Co. v. Revonet, Inc., 254 F.R.D. 147, 149–51 (D.D.C. 2008).

71 Christine Musil, *The Reality of Native Format and Production*, White Paper (Aug. 26, 2010), http://www.edrm.net/resources/edrm-white-paper-series/the-reality-of-native-format.

72 *See* Williams v. Sprint/United Mgmt. Co., 230 F.R.D. 640 (D. Kan. 2005) (ordering re-production of MS Excel spreadsheets in native form).

73 *See generally* Aguilar v. Immigration and Customs Enforcement Div., 255 F.R.D. 350 (S.D.N.Y. 2008); *In re* Priceline.com Inc. Sec. Litig., 233 F.R.D. 88 (D. Conn. 2005).

74 *See* http://www.justice.gov/atr/public/electronic_discovery/237704.htm; and http://www.ftc.gov/bc/guidance/preparing/native.shtm.